UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

MICHAEL TOLIVER,

                        Petitioner,

            v.

SUPERINTENDENT MICHAEL SHEAHAN,

                   Respondent.

-----------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 18, 2015
```

13 Civ. 5056 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

       Petitioner Michael Toliver, proceeding pro se, brings this timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). He challenges his conviction, following a jury trial in New York State Supreme Court, of three counts of Failure to Verify Registration Information and one count of Failure to Verify Annual Registration Information, each a violation under New York's Sex Offender Registration Act ("SORA"), N.Y. Correct. Law §§ 168 to 168-w. The Court has carefully considered the papers filed by both sides as well as the record of proceedings in the New York State courts. Because the state courts did not adjudicate Petitioner's claims in a manner that resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, his petition is denied.

## BACKGROUND[1]

**A.     The Sex Offender Registration Act**

### 1.     SORA's Enactment and General Framework

Resolution of Petitioner's many claims requires extensive analysis of SORA's enactment, amendment history, and relevant provisions.  On July 25, 1995, New York enacted SORA as the state analogue of the federal statute colloquially known as "Megan's Law."  *See* 1995 N.Y. Laws 2870 (codified at N.Y. Correct. Law §§ 168 to 168-w).  The statute took effect on January 21, 1996.  *See Doe* v. *Pataki* ("*Pataki III*"), 3 F. Supp. 2d 456, 459 (S.D.N.Y. 1998). SORA's objectives are "[i] to protect members of the public, especially vulnerable populations, from sex offenders by notifying [the public] of the presence of sex offenders in their communities and [ii] to enhance law enforcement authorities' ability to investigate and prosecute sex offenses."  *Doe* v. *Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) ("*Pataki IV*") (citing 1995 N.Y. Laws 2870 § 1).  To that end, "the Act requires all convicted sex offenders ('the registrants') to register with law enforcement authorities and provides for the disclosure of information about the registrants to local law enforcement authorities, entities with vulnerable populations, and the public at large in

---

[1]     The facts set forth herein are taken from Docket Entry 14, Respondent's opposition to the Petition.  There are eight attachments to that submission: Attachment 1 comprises the state court record, i.e., documents and decisions from the state courts, and is cited as "SR."  Attachments 2 through 8 are minutes from the trial court, including pre-trial, trial, and post-trial proceedings, and are cited as "Dkt. #14-[attachment number]." Petitioner has also submitted documentary support for his Petition that is cited as "Dkt. #2," in addition to other letters that are referenced by their docket numbers where appropriate.

The parties' memoranda of law are referred to as "Pet.," "Resp. Opp.," and "Pet. Reply."

enumerated circumstances." *Id.* at 70-71.  In New York City, a sex offender must register with the Sex Offender Management Unit ("SOMU") of the state Attorney General's Office at different time intervals as described below.  (*See* Dkt. #14-2 at 85).

As enacted, SORA allowed (and still allows, though the authorizing language has been amended over the years) the Board of Examiners of Sex Offenders (the "Board") to classify offenders as level one, level two, or level three risk based on the Board's assessment of whether the risk of repeat offense is respectively low, moderate, or high.  N.Y. Correct. Law § 168-*l*(6).[2]  Depending on the offender's risk classification, local law enforcement authorities are authorized to disseminate different levels of information about the offender, his or her offense, and any special conditions imposed.  *See id.*

Risk classifications also impact registration requirements.  Initially, SORA provided that

> [t]he duration of registration for a sex offender shall be annually for a period of ten years from the initial date of registration, provided, however, that for a sexually violent predator, he shall annually register and verify quarterly for a minimum of ten years unless the court determines in accordance with section one hundred sixty-eight-*o* of this article, that the person no longer suffers from a mental abnormality that would make him likely to engage in a predatory sexually violent offense.

---

[2]     The terms "designation" and "classification" should not be confused.  As used in the current version of SORA, an offender's risk level (one, two, or three) is his "classification," while offenders can also receive "designations" as "sexual predator," "sexually violent offender," or "predicate sex offender."  *See* N.Y. Correct. Law § 168-h (McKinney 2014).

*Id.* § 168-h (McKinney 1996).  Section 168-o set forth a mechanism for relief

from these reporting requirements:

> [a]ny sex offender required to register pursuant to this
> article may be relieved of any further duty to register
> upon the granting of a petition for relief by the
> sentencing court.  Upon receipt of the petition for relief,
> the court shall notify the board and request an updated
> report pertaining to the sex offender.  After receiving the
> report from the board, the court may grant or deny the
> relief sought.

*Id.* § 168-o.  And Section 168-t set forth penalties for non-compliance:

> [a]ny person required to register pursuant to the
> provisions of this article who fails to register in the
> manner and within the time periods provided for herein
> shall be guilty of a class A misdemeanor for the first
> offense, and for a second or subsequent offense shall be
> guilty of a class D felony.

*Id.* § 168-t.

Section 168-n outlined the judicial process by which an offender could be

designated as a "sexual offender" or a "sexually violent predator": the Board

would make a recommendation that the sentencing court would review "any

materials submitted by the sex offender" in conjunction with "any victim's

statement."  N.Y. Correct. Law § 168-n (McKinney 1996).  Section 168-n further

provided that "[t]he court shall also allow the sex offender to appear and be

heard, and inform the sex offender of his right to have counsel appointed, if

necessary."  *Id.* § 168-n(3).  In other words, SORA initially contemplated that

the court had the discretion, but not the obligation, to allow the offender to

make an appearance to be heard.

### 2.   Relevant Amendments to SORA

#### a.   1999 Amendments

SORA has been subject to numerous substantive amendments; the timing and content of several of these amendments are relevant here.  In 1999, the New York legislature amended SORA to incorporate extensive procedural due process requirements prompted by the district court's decision in *Pataki III*, 3 F. Supp. 2d at 473.  These amendments substantively changed Section 168-n, directing, among other things, that "[n]o later than thirty days prior to the board's recommendation, the sex offender shall be notified that his or her case is under review and that he or she is permitted to submit to the board any information relevant to the review," and "[t]he written notice to the sex offender shall also advise the offender that he or she has a right to a hearing prior to the court's determination, and that he or she has the right to be represented by counsel at the hearing."  1999 N.Y. Laws 453 § 168-n(3).

The 1999 amendments maintained the registration period as ten years from the original date of registration for all levels of sex offenders.  It also left unchanged the requirement that if the offender was a sexually violent predator, he or she would also have to personally verify his address every 90 days with the local law enforcement agency.  *See* 1999 N.Y. Laws 453 § 168-h.  Also unchanged was Section 168-t, which continued to provide that an initial registration violation would be a class A misdemeanor and any subsequent violation would be a class D felony.  *See id.* § 168-t.

### b.    2002 Amendments

In 2002, the legislature again amended the Act, building on existing offender-type designations in order to create designations for "sexual predator," "sexually violent offender," and "predicate sex offender."  *See* 2002 N.Y. Laws 66.[3]  It stated that any offender who was labeled any of these three offender-type designations on or after March 11, 2002, or any offender who was designated as a level three risk, would have to register and verify his address annually for life.  *Id.* § 168-h(2).  Level three risk offenders also were required to personally verify their addresses every 90 calendar days with local law enforcement.  *See id.* § 168-h(3).  By contrast, those who were not given an offender-type designation, or who were designated a level one or level two risk, would only have to register annually for ten years from the initial date of registration.  *See id.* § 168-h(1).

---

[3]      The current version of SORA retains these designations and defines them as follows:

> (a) "Sexual predator" means a sex offender who has been convicted of a sexually violent offense defined in subdivision three of this section and who suffers from a mental abnormality or personality disorder that makes him or her likely to engage in predatory sexually violent offenses.

> (b) "Sexually violent offender" means a sex offender who has been convicted of a sexually violent offense defined in subdivision three of this section.

> (c) "Predicate sex offender" means a sex offender who has been convicted of an offense set forth in subdivision two or three of this section when the offender has been previously convicted of an offense set forth in subdivision two or three of this section.

N.Y. Correct. Law § 168-a(7) (McKinney 2014).

### c. 2006 Amendments

In January 2006, the ten-year registration period for many level-one and level-two registrants was approaching an end, prompting a further amendment that increased the length of the registration requirements "to enhance public safety and provide better tracking and monitoring of sex offenders." 2006 N.Y. Laws 1 § 1. Specifically, the amendment increased the period of registration for offenders at risk level one from 10 years to 20, and for those at risk level two from 20 years to life. *Id.* § 168-h. It also extended the period before lifetime registrants (i.e., those classified as risk level three or designated as sexual predators, sexually violent offenders, or predicate sex offenders) could petition for relief from registration and verification requirements from 13 years to 20, *id.* § 168-o(1), but continued to provide that "[a]ny sex offender required to register or verify pursuant to this article may petition the sentencing court or the court which made the determination regarding the level of notification for an order modifying the level of notification," *id.* § 168-o(2).

### d. 2007 Amendments

Finally, in 2007, Section 168-t was amended to provide that an initial registration violation would constitute a class E felony rather than a class A misdemeanor, while any subsequent offense would continue to constitute a class D felony. *See* 2007 N.Y. Laws 373 § 168-t.

### 3. SORA as Applied to Petitioner

During 2008 and 2009, the relevant period for the Petition, a sex offender who had not been designated a sexual predator, a sexually violent offender, or

a predicate sex offender, and who was classified as a level one risk, or who had

not yet received a risk level classification, was required to register annually and

verify his address for 20 years from the initial date of registration.  *See* N.Y.

Correct. Laws § 168-h(1) (McKinney 2014).  By contrast, a sex offender who, on

or after March 11, 2002, was designated a sexual predator, sexually violent

offender, or predicate sex offender, or who was classified as a level two or level

three risk, was required to register annually for life.  *See id.* § 168-h(2).

Further, a "sex offender designated as a sexual predator or having been given a

level three designation [was required to] personally verify his or her address

with the local law enforcement agency every ninety calendar days after the date

of release or commencement of parole or post-release supervision, or

probation."  *Id.* § 168-f(3).  Finally, "[a]ny sex offender [was required to] register

with the division no later than ten calendar days after any change of address."

*Id.* § 168-f(4).  An initial conviction for failure to register constituted a class E

felony, and any second or subsequent violation constituted a class D felony.

*See id.* § 168-t.

Sex offenders such as Petitioner are informed of their obligations upon

sentencing or prior to release from prison:

> Any sex offender, who is released on probation or
> discharged upon payment of a fine, conditional
> discharge or unconditional discharge shall, prior to
> such release or discharge, be informed of his or her duty
> to register under this article by the court in which he or
> she was convicted.  At the time sentence is imposed,
> such sex offender shall register with the division on a
> form prepared by the division.  The court shall require
> the sex offender to read and sign such form and to
> complete the registration portion of such form.

N.Y. Correct. Laws § 168-d(2) (McKinney 2014).  On the particular issue of offender designation, Section 168-n states, "A determination that an offender is a sexual predator, sexually violent offender, or predicate sex offender as defined in subdivision seven of section one hundred sixty-eight-a of this article shall be made prior to the discharge, parole, release to post-release supervision or release of such offender."  *Id.* § 168-n(1).

### 4.   Redetermination Hearings Pursuant to the *Doe* v. *Pataki* Settlement

On March 6, 1996, plaintiffs in *Doe* v. *Pataki,* No. 96 Civ. 1657 (DC), brought a class action against then-Governor George Pataki seeking declarative and injunctive relief.  *Pataki III*, 3 F. Supp. 2d at 456, 465.[4]  Plaintiffs claimed that SORA as originally enacted was unconstitutional as applied to individuals who committed their crimes before the Act took effect on January 21, 1996, under the Ex Post Facto, Due Process, and Equal Protection Clauses of the United States Constitution.  *Id.*  The district court held that that the Act's original procedures for determining risk levels violated sex offenders' procedural due process rights and that offenders facing risk level classification were entitled to, among other things, a hearing, notice of the evidence upon which the risk level recommendation was based, and the right to appeal.  *Id.* at 473.  The New York State legislature soon thereafter passed the first major

---

[4]     The first decision on this matter was *Doe* v. *Pataki* ("*Pataki I*"), 940 F. Supp. 603, 631 (S.D.N.Y. 1996).  It was appealed and reversed in *Doe* v. *Pataki* ("*Pataki II*"), 120 F.3d 1263, 1285 (2d Cir. 1997), after which the decision discussed here ("*Pataki III*"), was issued.

amendment to SORA in 2002 to provide sex offenders notice and an opportunity to be heard.

The parties to the class action remained in settlement discussions until June 2004. *Pataki IV*, 481 F.3d at 73. On June 2, 2004, then-United States District Judge Denny Chin signed a Stipulation of Settlement that, among other things, ushered in a period of risk level redetermination hearings. "The Stipulation, the stated purpose of which was to 'settl[e] the disputes between [the parties] and avoid[] further litigation,' specified detailed procedures for conducting redetermination hearings for level two and level three Plaintiffs and for notifying them of their right to such hearings." *Id.* at 73; *see also id.* at 74 (explaining the notification process).

## B.   Petitioner's SORA Designations

### 1.   Petitioner's Initial Designation

Petitioner was charged with sodomizing a 13-year-old male in a subway station on April 4, 1991. *People* v. *Toliver*, 629 N.Y.S.2d 746, 747 (1st Dep't 1995). After his first trial resulted in a hung jury, *see People* v. *Toliver*, 89 N.Y.2d 843, 844 (1996), Petitioner was convicted at a 1992 retrial of Criminal Sexual Act in the Second Degree, in violation of N.Y. Penal Law § 130.45. (Dkt. #14-5 at 51; Dkt. #14-6 at 35).

On November 19, 1996, Petitioner's conviction was reversed by the New York Court of Appeals because the trial judge had been absent from the courtroom during the prosecution's questioning of prospective jurors. *See Toliver*, 89 N.Y.2d at 845. Petitioner was subsequently retried on the same

charge, and was convicted on November 25, 1997, before the Honorable Edward J. McLaughlin.  (Dkt. #14-6 at 35; Dkt. #14-3 at 131).

Petitioner's initial "New York State Sex Offender Registration Form," dated February 14, 1996, was signed by him in two places.  (Dkt. #14-4 at 102, 103, 122).[5]  The form notified Petitioner of his address verification responsibilities as a level three sex offender in accordance with the version of SORA in force during that time.  After the 2002 amendments, Petitioner was required to report to SOMU every 90 days to verify his address and to mail an annual verification letter to the Division of Criminal Justice Services ("DCJS").  (Dkt. #14-2 at 87-88).  Although the conviction underlying these registration obligations was vacated by the New York Court of Appeals on November 19, 1996, there is no evidence of a second risk level determination after Petitioner's subsequent conviction on retrial.

### 2.   Petitioner's Prior Failure to Register Conviction[6]

On April 27, 1998, Petitioner was charged with Failure to Register under SORA, Criminal Trespass in the Third Degree, and False Personation; the charges arose from an incident in which Petitioner entered a building at Fordham Law School in Manhattan.  (Pet. 40-41).  The criminal complaint alleged that although Petitioner had advised SOMU on April 16, 1998, that he

---

[5]     There appears to have been a typographical error: SORA was not in effect in 1995, but the document was stamped February 14, 1995, in at least one place.  It was also stamped February 14, 1996.  (Dkt. #14-4 at 122).

[6]     Other evidence of prior criminal acts was discussed at trial, but is not discussed here except where relevant to the Petition.

resided at 1430 Amsterdam Avenue, he stated on the day of his arrest — a mere eleven days later — that he resided at 21 Bleecker Street.  (*Id.* at 41).

The parties dispute the charge(s) to which Petitioner pleaded guilty on August 18, 1998.  Petitioner maintains, both at his 2009 trial and in the Petition, that he did not plead guilty to the failure to register charge.  Instead, Petitioner believes that he pleaded guilty to possession of burglar's tools in an entirely different case.  (Dkt. #14-6 at 14-15, 23, 135-41).  According to the 1998 court reporter's transcript as well as the court clerk's minutes, however, Petitioner in fact pleaded guilty to the failure to register charge.  (Pet. 42; Dkt. #14-5 at 154-55; Dkt. #14-7 at 20).  To add to the confusion, the 2009 trial court indicated during a sidebar that it had access to a plea allocution or agreement showing that Petitioner pleaded guilty both to failure to register and to possession of burglar's tools on that day (Dkt. #14-6 at 137-38), though such allocution or agreement was never introduced at trial.  As discussed later in this Opinion, these discrepancies do not provide grounds for relief.

### 3.    Petitioner's Redesignation

On February 14, 2005, Petitioner was sent a letter from the New York County Clerk's Office to an address he had provided at 464 Hudson Street in Manhattan; the letter made reference to his initial sodomy conviction and gave him notice "concerning his rights to challenge his sex offender registration level." (Dkt. #14-6 at 16-25).  Petitioner was sent this letter in response to the settlement arrived at in *Doe* v. *Pataki*.  (Pet. 54 (document showing that on June 20, 2005, Petitioner was redetermined to be a level three offender in a

"Redetermination Proceeding Pursuant to Stipulation of Settlement in *Doe* v. *Pataki*, 96 Civ. 1657 (DC)"); *see also* Dkt. #14-6 at 26-33).  The letter noted that as of that date, Petitioner was registered as a level three sex offender and that he was required, "among other registration obligations, to verify your address annually by mail for life, as well as every 90 days in person with your local law enforcement agency." (Dkt. #14-6 at 23).  Petitioner responded to the letter indicating that he wanted a "risk level determination proceeding" and that he wanted a lawyer for the proceeding.  (*Id.* at 340-42).

On June 20, 2005, a risk level redetermination hearing was held before Justice McLaughlin — the very judge who had presided over Petitioner's 1997 retrial.  (Dkt. #14-5 at 159-60; Dkt. #14-3 at 131).  At the hearing, Justice McLaughlin adjudicated Petitioner a risk level three sex offender.  (Dkt. #14-5 at 156-62; Dkt. #14-6 at 26-34; *see also* Pet. 54-55).[7]

## B.   Petitioner's 2009 Trial for Failure to Register

In the criminal prosecution underlying the Petition, Petitioner was charged with failure to verify his 90-day registration on three dates — June 14, 2008, October 13, 2008, and January 12, 2009 — and with failure to verify his annual registration on February 24, 2009.  (Dkt. #14-3 at 207).  On July 29, 2010, Petitioner proceeded to trial on these charges before the Honorable

---

[7]     The People's case included documentary evidence of Petitioner's reporting obligations and knowledge thereof, including Petitioner's initial registration form (Dkt. #14-6 at 147) and his 2005 notice of redetermination rights letter (*id.* at 23).  At trial, Petitioner conceded that a level three offender was required to register annually for life and must personally verify his address every 90 days.  (*Id.* at 108-09).  He claimed that he personally calculated the 90-day intervals by which to return to the SOMU office.  (*Id.* at 122).

Bonnie Wittner (*id.* at 11), though the case was transferred multiple times (*see infra*). Because Petitioner raises numerous claims concerning the fairness of this prosecution, it is discussed in some detail in the remainder of this section.

### 1.   The People's Case

On June 27, 2007, Petitioner met with Officer Lisa Marie Newkirk at the SOMU office in Manhattan and provided proof of his current address pursuant to his obligations under SORA. (Dkt. #14-4 at 66-67). Newkirk gave Petitioner a copy of SOMU's rules and regulations governing registration requirements, but Petitioner refused to sign for the packet of information. (*Id.* at 67-68). She also gave him a 90-day appearance slip indicating when to return to make his next verification. (Dkt. #14-7 at 1-2).

On September 12, 2007, Petitioner submitted a change of address form to DCJS, disclosing that, on August 31, 2007, he had moved to 545 West 146th Street in Manhattan. (Dkt. #14-4 at 108-16). However, Petitioner failed to notify DCJS of any subsequent address change: from September 12, 2007, until February 11, 2009 (when DCJS sent Petitioner his annual verification form), DCJS had no other record of his living anywhere but 545 West 146th Street. (*Id.* at 120-21).

On April 10, 2008, Petitioner reported to the Manhattan SOMU office to verify his address with Officer Newkirk. (Dkt. #14-4 at 60-63, 75; *id.* at 156). During an "extended interview" with Petitioner on that date, Newkirk "tr[ied] to convince" Petitioner to remain compliant with his registration obligations. (*Id.* at 80). Newkirk also gave Petitioner an appointment sheet indicating that he

14

was next scheduled to report to SOMU on July 14, 2008.  (*Id.* at 62).  Petitioner signed that appointment sheet, acknowledging that he had received it.  (*Id.* at 62-63).  Petitioner did not, however, report to SOMU on July 14, 2008.  (*Id.* at 77-78, 145-46, 185, 219-20).  In consequence, on August 12, 2008, Detective Wendy Santiago went to Petitioner's last reported address at 545 West 146th Street in an attempt to locate him.  Petitioner was not at this address, and the occupant of the apartment said that Petitioner no longer lived there.  (*Id.* at 146-51).  SOMU representatives testified, relying in part on sign-in sheets maintained in the ordinary course of business, that Petitioner never returned voluntarily to the SOMU office after his April 10, 2008 appointment, missing two subsequent verification appointments on October 13, 2008, and January 12, 2009.  (*Id.* at 77-78, 88; *see also id.* at 178-81).

On February 11, 2009, DCJS mailed a non-forwardable annual verification form to Petitioner's last known address at 545 West 146th Street.  (Dkt. #14-4 at 115-17, 119-20).  On February 20, 2009, the postal service returned the blank form to DCJS, with the notations "return to sender" and "vacant."  (*Id.* at 130-31, 151).

On March 11, 2009, NYPD Detective Carlos Sanchez, who was also assigned to SOMU, learned that Petitioner had filed a complaint with the police concerning his roommate.  (Dkt. #14-4 at 185-86, 202).  The complaint report system listed Petitioner's address as 894 Riverside Drive, New York, New York.  (*Id.* at 185-86).  Sanchez went to the listed address; although Petitioner was not there, another occupant confirmed that Petitioner rented a room in the

identified apartment. (*Id.* at 186-87). Sanchez gave the occupant his business card and attempted to reach Petitioner on his mobile telephone. (*Id.*).

On March 17, 2009, Petitioner called Detective Sanchez. (Dkt. #14-4 at 187). Sanchez told Petitioner to report to SOMU the following day, but in the meantime decided to verify that Petitioner in fact resided at 894 Riverside Drive by returning there on March 18, 2009, at around 7:30 a.m. (*Id.* at 187, 189). He knocked on the door to Petitioner's apartment but received no response. (*Id.* at 189). A neighbor who was in charge of the apartment opened the door with his key and directed Sanchez to Petitioner's room. (*Id.*). As Sanchez knocked on the door to Petitioner's room, the door opened and Sanchez observed Petitioner sitting on his bed. (*Id.* at 189-90). Sanchez identified himself and asked Petitioner to accompany him to SOMU; Petitioner agreed. (*Id.* at 190, 222-26).

Upon returning to the SOMU office, Sanchez interviewed Petitioner. (Dkt. #14-4 at 190-91). Prior to commencing the interview, Sanchez read Petitioner his *Miranda* rights; though Petitioner orally waived his rights, he refused to sign the waiver form or answer any questions. (*Id.* at 191-99). When Sanchez informed Petitioner that SOMU "need[ed] to know this information," Petitioner replied that SOMU would not be "getting that information." (*Id.* at 198). Sanchez told Petitioner that he would be arrested whether or not he answered Sanchez's questions, and that he would have to return to SOMU "to register and give [SOMU] this information," but Petitioner said that he was "never going to return" to the SOMU office, and that "the only

way he was going to come back is if [the officers] arrested him." (*Id.* at 198).  At approximately 11:30 a.m., Detective Sanchez placed Petitioner under arrest. (*Id.* at 182-83, 225; *see also* Dkt. #14-6 at 1-2).

On March 27, 2009, a grand jury indicted Petitioner on three counts of Failure to Verify Registration Information, in violation of N.Y. Correct. Law § 168-f(3), and one count of Failure to Verify Annual Registration Information, in violation of N.Y. Correct. Law § 168-f(2).  (Pet. 76-78).

### 2.   Petitioner's Case

Unsurprisingly, Petitioner's version of the facts differed.  He argued that he had been harassed by SOMU detectives, who had a vendetta against him because of his sexual orientation, his sex offender status, and his prior lawsuits and complaints against certain officers.  (Dkt. #14-6 at 71-72). Petitioner testified that he had met with Officer Newkirk at SOMU's Manhattan office roughly 20 to 25 times, and that on several occasions he had been made to wait until the office closed without seeing an officer.  (*Id.* at 48, 59, 126-27). He also recalled appearing at SOMU on unscheduled dates.  (*Id.* at 59).

Petitioner recalled that on September 16, 2007, he informed his parole officer, David Segal, that he had moved to 545 West 146th Street in Manhattan.  (Dkt. #14-6 at 54-55).  Segal completed a change of address form, which Petitioner signed and Segal filed with DCJS.  (*Id.*).  Petitioner further testified that he moved to 894 Riverside Drive on June 10, 2008, and that he notified DCJS of this change of address by letters dated April 20, 2008, and June 10, 2008.  (*Id.* at 117, 143-45).

Petitioner and Officer Newkirk were in agreement that he appeared at SOMU on April 10, 2008.  (Dkt. #14-6 at 122).  Petitioner testified, however, that Newkirk did not give him a new date in writing, but rather that he calculated a date of July 14, 2008, as his return date.  (*Id.* at 122).  As such, he claimed, the signature on the April 10, 2008 SOMU appointment reminder was not his.  (*Id.* at 57, 117, 122-23).  Petitioner further contended that he appeared at SOMU on July 14, 2008, but that detectives refused to meet with him in retaliation for the lawsuit he had filed against them.  (*Id.* at 58-68, 122-23, 128).  Eventually, according to Petitioner, Newkirk gave him a handwritten proof of appearance and told him to appear again on October 13, 2008.  (*Id.* at 68, 79-82, 123-24, 128-30).[8]

Petitioner testified that he did appear at SOMU on October 13, 2008, to verify his address; Detective Sanchez first refused to meet with him and then acknowledged him, but told him to leave without registering him.  (Dkt. #14-6 at 85-87, 130-32).  He further stated that on this visit he met with Officer Newkirk, but that she told him that she would deny having seen him.  (*Id.* at 87-89, 124).  He claimed that he returned to SOMU on January 12, 2009, personally calculating that date as his return date because Newkirk would not give him a return date at their October 13, 2008 meeting.  (*Id.* at 124-25).

---

[8]     Newkirk denied having seen Petitioner or given him any such note on that date, and testified that she did not recognize the handwriting on the document proffered as the proof of appearance.  (Dkt. #14-6 at 502-04).

### 3.     The Verdict and Sentence

The jury disbelieved Petitioner, and on August 6, 2010, it returned a verdict convicting him on all four counts.  (Pet. 93; SR 48).  On September 13, 2010, Petitioner was sentenced to an aggregate prison term of twenty-eight months' to seven years' imprisonment.  (Pet. 93; SR 207).

### C.     Petitioner's Direct Appeal

Represented by counsel, Petitioner appealed his 2010 conviction to the Appellate Division of the New York State Supreme Court, First Judicial Department, on January 20, 2012.  (SR 1).  He argued that his Sixth and Fourteenth Amendment Rights had been violated because of jury selection procedures in contravention of *Batson* v. *Kentucky*, 476 U.S. 79 (1986).  (*Id.* at 7).  Specifically, Petitioner argued that the prosecutor's challenges to three African-American jurors were pretexts for unlawful discrimination (*id.* at 21-30), and that the trial court had erred in denying Petitioner's for-cause challenge to a juror who was "not sure" whether she could be influenced by a co-worker in her deliberations (*id.* at 30-38).  On September 10, 2012, Petitioner filed a pro se supplemental brief raising a series of additional, and sometimes overlapping, claims; many of these claims are reiterated in the Petition and are discussed later in this Opinion.  (*Id.* at 116-18).

On January 3, 2013, the First Department affirmed Petitioner's conviction.  *See People* v. *Toliver*, 958 N.Y.S.2d 95 (1st Dep't 2013).  The court held that the trial court had properly denied Petitioner's *Batson* challenge because "[t]he record supports the court's finding that the nondiscriminatory

reasons provided by the prosecutor for the challenges at issue were not pretextual." *Id.* The court declined to address part of the *Batson* argument — that the prosecutor had struck a black juror for only having a high-school education, but did not so strike a white juror with a similar education — on the grounds that it was unpreserved, but in the alternative held that "the record does not support a claim of disparate treatment by the prosecutor of similarly situated panelists." *Id.* The court further held that the trial court had properly exercised its discretion in denying a for-cause challenge by the defense. *Id.* Finally, the court held that "Defendant's pro se claims are without merit." *Id.*

D.     **Petitioner's Appeal to the New York Court of Appeals**

Petitioner sought leave to appeal to the New York Court of Appeals in January 2013, by means of three separate letters. Appellate counsel first submitted a letter dated January 4, 2013, asking for "permission to appeal to the Court of Appeals in the above case"; he did not specify claims, but enclosed "the briefs submitted to the Appellate Division and that Court's decision." (SR 210-11). Petitioner then wrote a letter on January 11, 2013, requesting review of his case and noting that he had filed a pro se motion in the Appellate Division. (*Id.* at 212-15).[9] Appellate counsel then filed a third letter on January 18, 2013, requesting review for "the Batson and for cause jury selection errors, and for all the reasons in the pro se supplemental brief." (*Id.* at 210-19). On February 8, 2013, the District Attorney of the County of New

---

[9]     In this letter, Petitioner stated that because his attorney would only raise some issues to the Appellate Division, he was forced to proceed pro se on his other constitutional claims.

York filed a letter opposing leave to appeal.  (*Id.* at 220-22).  On June 13, 2013,

the Court of Appeals denied Petitioner's request for leave to appeal.  (*Id.* at

223).  *See People* v. *Toliver*, 21 N.Y.3d 1011 (2013).

## E.    The Instant Petition

On July 17, 2013, Petitioner filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenging his September 13, 2010 convictions.

(Dkt. #1).  Petitioner purports to assert ten grounds for relief.  The first nine are

easily discernible from the Petition and include claims that (i) Petitioner was

arrested without probable cause and his conviction was obtained by use of

evidence obtained pursuant to an unlawful arrest; (ii) Petitioner was sentenced

to class D felonies instead of class E felonies in violation of the Ex Post Facto

Clause; (iii) the trial court admitted into evidence two "illegal" certificates of

conviction (1997-98 and 2005) and one "illegal" risk level determination

document; (iv) the prosecution offered "illegal" documentary evidence both in

the grand jury and trial proceedings; (v) Petitioner was denied effective

assistance of counsel; (vi) an exculpatory affidavit was improperly excluded;

(vii) Petitioner's registration obligations had expired in 2005, five years prior to

his arrest; (viii) Petitioner was improperly made to appear before the jury in

prison attire; and (ix) the jury was unconstitutionally selected and impaneled.

(Pet. 5-20).

For his tenth ground, Petitioner contends that his conviction was

unlawfully obtained pursuant to all of the grounds raised in his supplemental

submission on his direct appeal.  (Pet. 23).  The Court thus continues the

numbering of his claims raised directly to the appellate court, but only indirectly to this Court: (x) certain proceedings occurred outside Petitioner's presence in violation of the Confrontation Clause; (xi) the trial court erred in overruling an objection to the prosecutor's statement that Petitioner had presented forged documents; (xii) Petitioner was not allowed to review redactions; (xiii) the court improperly failed to dismiss Count Four of the indictment; (xiv) the verdict went against the weight of the evidence; (xv) the trial judge gave improper jury instructions; (xvi) Petitioner was prevented from having a meaningful opportunity to make a full record for appellate review; (xvii) the trial court improperly refused to order a probable cause hearing; and (xviii) the trial court refused to suppress involuntary statements.  (*See* SR 116-20, 162-65, 175).[10]

Petitioner applied for appointment of counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.  (Dkt. #9).  On October 29, 2013, the Court denied Petitioner's application, finding that the issues raised by the case were generally straightforward and that Petitioner had not required the services of counsel in other actions that he had filed in this District.  (*Id.*).

After receiving two extensions from the Court, on January 30, 2014, Respondent submitted its opposition to the Petition.  (Dkt. #14, 15).  On February 19, 2014, the briefing was fully submitted when Petitioner submitted his reply.  (Dkt. #16).

---

[10]    For convenience, the Court numbers these claims according to the order in which they are addressed by Respondent, except that Grounds 17 and 18 are identified separately by this Court.  (*See* Resp. Opp. 45).

## DISCUSSION

**A.    Applicable Law**

**1.    AEDPA Requirements**

Under the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), "a person in custody pursuant to the judgment of a State court"

may petition a federal court for a writ of habeas corpus "only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the

United States."  28 U.S.C. § 2254(a).  Relief may not be granted on such

grounds pursuant to a State court judgment if the claim was "adjudicated on

the merits in State court proceedings unless the adjudication of the claim

> [i] resulted in a decision that was contrary to, or
> involved an unreasonable application of clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or
>
> [ii] resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding."

*Id.* § 2254(d).[11]

The Supreme Court has repeatedly cautioned that "this standard … is

difficult to meet."  *White* v. *Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting

*Metrish* v. *Lancaster*, 133 S. Ct. 1781, 1786 (2013)) (internal quotation marks

omitted).  Further, "clearly established Federal law … includes only the

holdings, as opposed to the dicta, of [Supreme Court] decisions.  *Id.* at 1702

---

[11]    In order for a claim to be "adjudicated on the merits," as required under Section
2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it
must be "based on the substance of the claim advanced, rather than on a procedural,
or other, ground."  *Sellan* v. *Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).

(quoting *Howes* v. *Fields*, 132 S. Ct. 1181, 1187 (2012)) (internal quotation marks omitted); *accord Rodriguez* v. *Miller*, 537 F.3d 102, 106-07 (2d Cir. 2008) ("No principal of constitutional law grounded solely in the holdings of the various courts of appeals or even in dicta of the Supreme Court can provide the basis for habeas relief.").

The "contrary to" and "unreasonable application" clauses have "independent meaning." *Williams* v. *Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring in part, concurring in the judgment, and delivering the opinion of the Court with respect to this part of the opinion). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13. "[A]n unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White*, 134 S. Ct. at 1702 (quoting *Lockyer* v. *Andrade*, 538 U.S. 63, 75-76 (2003)) (internal quotation marks omitted).

In contrast, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case difference than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. The Supreme Court has instructed that a petitioner seeking relief under this prong of Section 2254 "must show that the state court's ruling on the claim being presented in federal

court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *White*, 134 S. Ct. at 1702 (quoting *Harrington* v. *Richter*, 562 U.S. 86, 102-03 (2011)) (internal quotation marks omitted).  Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and such presumption may be rebutted only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### 2.    The Exhaustion Requirement

"Before a federal court may grant habeas relief to a prisoner in state custody, the prisoner must exhaust his or her state court remedies." *Galdamez* v. *Keane*, 394 F.3d 68, 72 (2d Cir. 2005); *see* 28 U.S.C. § 2254(b)(1)(A).  In order to exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan* v. *Boerckel*, 526 U.S. 838, 845 (1999).  In New York, to complete a round of the State's appellate review, "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez*, 394 F.3d at 74.

Second, a court must determine whether the petitioner "properly exhausted those state remedies, i.e., whether petitioner has fairly presented his or her claims to the state courts." *Galdamez*, 394 F.3d at 73 (internal alterations and quotation marks omitted).  It is this second inquiry that

"embodies the concept of procedural default," such that "a petitioner cannot claim to have exhausted his or her remedies by dint of no longer possessing 'the right under the law of the State to raise, by any available procedure, the question presented,' if at some point the petitioner had that right but failed to exercise it." *Id.* at 73-74 (quoting 28 U.S.C. § 2254(c)). "Generally, procedural default for failure to comply with a state procedural requirement bars habeas review only when the state court rendering the judgment 'clearly and expressly states that its judgment rests on a state procedural bar.'" *Id.* at 77 (quoting *Glenn* v. *Bartlett,* 98 F.3d 721, 724 (2d Cir. 1996)).[12]

To fairly present a claim, a petitioner must "inform[] the state court of both the factual and legal premises of the claim that he asserts in federal court," *Daye* v. *Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982), though a petitioner is not required "to cite 'chapter and verse' of the Constitution to satisfy the exhaustion rule," *Levine* v. *Comm'r of Corr. Servs.*, 44 F.3d 121, 124 (2d Cir. 1995). Rather, a petitioner may fairly present his claim by "relying on federal and state cases that employ a constitutional analysis, asserting the claim in terms that call to mind a specific right protected by the Constitution, or alleging facts that fall well within the mainstream of constitutional litigation." *Levine*, 44 F.3d at 124 (internal quotation marks omitted).

---

[12]   Federal courts will not apply a state procedural bar, such as the contemporaneous objection rule, to block a federal claim where the state courts did not rely upon these grounds.  *See Delvalle* v. *Herbert*, 129 F. App'x 646, 649 (2d Cir. 2005) (summary order).

**B.    Analysis**

As an initial matter, the Court construes Petitioner's claims broadly

because he is proceeding pro se.  *Crosson* v. *Recktendald*, No. 14 Civ. 1865

(AJN)(JCF), 2015 WL 694831, at *2 (S.D.N.Y. Feb. 18, 2015) ("Habeas petitions

filed by a *pro se* petitioner must be construed liberally." (citing *Thompson* v.

*Choinski*, 525 F.3d 205, 209 (2d Cir. 2008)).  To that end, the Court has

reviewed the Petition, including the incorporated Supplemental Brief submitted

to the First Department (*see* SR 103-69), the reply, and other supporting

papers liberally, and has interpreted them "to raise the strongest arguments

that they *suggest*." *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d

Cir. 2006) (per curiam) (emphasis in original) (quoting *Pabon* v. *Wright*, 459

F.3d 241, 248 (2d Cir. 2006)).  Despite the expansive interpretation granted to

Petitioner's claims, the Court concludes that none entitles him to habeas relief.

**1.    Petitioner Has Exhausted All Grounds**

Petitioner has raised a total of eighteen grounds of relief before this

Court.  This figure includes the nine grounds directly alleged in his Petition,

and nine additional grounds incorporated into the Petition from his pro se

appellate brief.[13]  Respondent concedes that Petitioner has exhausted Ground

Two (the Ex Post Facto challenge to his sentence); Ground Nine (the jury

selection challenges); and Ground Ten (the challenge to his absence from

certain proceedings).  (Resp. Opp. 19).  Respondent makes this concession on

---

[13]    Respondent raises no objection to incorporating these grounds from the pro se appellate
brief into the Petition, and indeed addresses them in its answer.  (Resp. Opp. 45-60).

the basis that, unlike the remaining claims, Petitioner cited Supreme Court case law and the Constitution for these grounds in his counseled and *pro se* appellate briefs and then applied to the New York Court of Appeals for leave to appeal.

As to Petitioner's remaining grounds for relief, Respondent argues that he has failed to exhaust those grounds because he "did not cite case law or the constitution in support of those claims." (Resp. Opp. 19-20). In so doing, however, Respondent imposes a burden upon Petitioner not required by law. As explained above, Petitioner need not have cited the particular constitutional amendment, Supreme Court case, or governing federal standard implicated by his claims. *See Levine*, 44 F.3d at 124. Rather, this Court may properly find that Petitioner fairly presented his claims, and thus that such claims would be deemed exhausted, by "[i] relying on federal and state cases that employ a constitutional analysis, [ii] asserting the claim in terms that call to mind a specific right protected by the Constitution, or [iii] alleging facts that fall well within the mainstream of constitutional litigation." *Id.* (internal quotation marks omitted); *accord Arroyo* v. *Lee*, 831 F. Supp. 2d 750, 760 (S.D.N.Y. 2011).

### a.      **Petitioner Has Fairly Presented His Claims**

Generally, in order to "fairly present" a claim to the New York Court of Appeals, a petitioner cannot simply argue some of the claims in detail to the Court and then attach "an appellate brief without explicitly alerting the state court to each claim raised." *Jordan* v. *Lefevre*, 206 F.3d 196, 198-99 (2d Cir.

2000); *accord Grey* v. *Hoke*, 933 F.2d 117, 120 (2d Cir. 1991).  "Petitioner's counsel has the obligation to set out these arguments.  Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave."  *Jordan*, 206 F.3d at 199.[14]

Significantly, however, a grounds for appeal clearly laid out in another submission and explicitly referenced in a letter to the New York Court of Appeals can satisfy this burden.  In *Jordan*, the Second Circuit held that the petitioner there had not fairly presented certain claims to the New York Court of Appeals, having written a single letter that made only a passing reference to the additional claims in the final paragraph.  206 F.3d at 198 (asking leave to appeal "for all of these reasons and the reasons set forth in his Appellate Division briefs").  However, the Court noted

> [h]ad appellant more clearly stated that he was pressing all of the claims raised in the attached brief, or had his letter made no argument in detail but rather only requested that the Court of Appeals consider and review all issues outlined in defendant-appellant's brief, the result here would be different and the remaining claims would have been fairly presented to the Court of Appeals.

*Id.* at 199 (internal alterations and quotation marks omitted) (citing *Morgan* v. *Bennett*, 204 F.3d 360, 370-71 (2d Cir. 2000)).

---

[14]    This rule is based in part on the New York Court of Appeals Rules of Practice, which indicate that applications for appeal to the Court of Appeals "shall be by letter" and "shall indicate … the grounds upon which leave to appeal is sought."  N.Y. Ct. App. Rules § 500.20(a).

The *Morgan* case distinguished by the *Jordan* Court involved a situation where the petitioner's initial letter to the Court of Appeals had explicitly requested that it "consider and review all issues outlined in defendant-appellant's brief and *pro se* supplemental brief submitted to the Appellate Division." *Morgan*, 204 F.3d at 369-70 (internal quotations omitted). The Second Circuit held that this incorporation by reference was "sufficiently specific" to alert the Court of Appeals that the petitioner sought review of all of the issues raised in the pro se supplemental brief to the Appellate Division. *Id.* at 371. Similarly, in *Bumpus* v. *Superintendent of Clinton Corr. Facility*, 507 F. Supp. 2d 246 (E.D.N.Y. 2007), the petitioner's counsel wrote a letter for leave that did not raise any specific grounds for appeal, with attached copies of the Appellate Court's decision and the briefs to the Appellate Court, and the petitioner wrote a second pro se letter raising only one claim. *Id.* at 255. The Second Circuit held that the first letter "fairly presented" all claims raised in the appellate briefs, and that the second letter did not serve to narrow the scope of those claims. *Bumpus* v. *Warden Clinton Corr. Facility*, 311 F. App'x 400, 401 (2d Cir. 2009) (summary order); *accord Davis* v. *Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001) (noting that an initial letter to the Court of Appeals fairly presented arguments, and a subsequent letter did not narrow the scope of claims raised).

Here, Petitioner filed three letters with the New York Court of Appeals. The first letter, submitted by appellate counsel, stated, "Enclosed are the briefs submitted to the Appellate Division and that Court's decision. We request the

30

Court to consider and review all issues outlined in defendant-appellant's brief." (SR 210).[15] The second letter, submitted pro se, notified the Court of Appeals of Petitioner's supplemental pro se brief; noted that it identified "several constitutional issues"; and specifically elaborated on the Ex Post Facto Clause claim before urging the Court to "accept this application to proceed pro se with [Petitioner's] supplemental brief as described above and submitted to the appellate court." (*Id.* at 212-15). Finally, the third letter, filed by counsel, asked the Court to grant leave to appeal "based on the *Batson* and for cause jury selection errors, and for all the reasons in the *pro se* supplemental brief," and asked the Court "to review the full arguments in the briefs." (*Id.* at 218). Accordingly, even if Petitioner's counsel only intended to raise the counseled claims in his first letter to the Court of Appeals, the subsequent letters sufficiently brought the other pro se claims to the Court's attention. *See Galdamez*, 394 F.3d at 76. The Court thus finds that all of Petitioner's claims are fairly presented.

### b.  The Grounds Are Not Procedurally Defaulted

There remains the separate antecedent issue of procedural default. "Procedural default for failure to comply with a state procedural requirement bars habeas review only when the state court rendering the judgment clearly and expressly states that its judgment rests on a state procedural bar."

---

[15]     It is unclear whether Petitioner's counsel sent only his brief or the pro se supplemental brief as well to the Court of Appeals with this first application. In his last sentence, he asked the Court to consider the "issues outline in defendant-appellant's *brief*." (SR 210 (emphasis added)).

*Galdamez*, 394 F.3d at 77 (internal quotation marks omitted).  Here, the Appellate Division simply stated that "Defendant's pro se claims are without merit."  *Toliver*, 958 N.Y.S.2d at 96.  The Court of Appeals denied leave to appeal without decision, but that does not change the result: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst* v. *Nunnemaker*, 501 U.S. 797, 803 (1991).  Under such circumstances, courts "will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place."  *Id.*; *see also Sellan* v. *Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001) (finding that an adjudication "on the merits" does not require the state court to explain its decision).

Neither appellate court made reference to any procedural bars as a reason to affirm the trial court or to deny leave to appeal; rather, the Appellate Division specifically found the claims to be "without merit."  Therefore, there is no procedural default preventing the Court from addressing Petitioner's claims on their merits.

### 2. The Appellate Court's Determination of Petitioner's Claims Was Neither Contrary to Nor an Unreasonable Application of Federal Law

Construing the Petition broadly due to Petitioner's pro se status, the Court identifies eighteen grounds for relief that can be grouped into twelve categories:

(i)  Challenges under the Fourth and Fifth Amendments to his 2009 arrest and to the use of statements obtained

pursuant to this arrest (Grounds One, Seventeen, and Eighteen);

(ii)     An Ex Post Facto Clause challenge to his sentence (Ground Two);

(iii)    A Due Process Clause challenge to the admission of certain documentary evidence and the exclusion of certain allegedly exculpatory evidence (Grounds Three, Four, and Six);

(iv)     A Sixth Amendment ineffective assistance of counsel claim (Ground Five);

(v)      A Due Process Clause challenge to the sufficiency of the evidence (Grounds Seven, Thirteen, and Fourteen);

(vi)     A Due Process Clause challenge to being made to appear in prison attire at trial (Ground Eight);

(vii)    An Equal Protection Clause challenge to the selection of the jury under *Batson* v. *Kentucky*, 476 U.S. 79 (1986) (Ground Nine);

(viii)   A Confrontation Clause challenge and a Due Process Clause challenge to Petitioner's absence from certain court proceedings (Ground Ten);

(ix)     A Due Process Clause challenge to a prosecutor's statement in summation (Ground Eleven);

(x)      A Due Process Clause and Sixth Amendment challenge arising from Petitioner's inability to review redacted documents prior to their submission to the jury (Ground Twelve);

(xi)     A Due Process Clause challenge to the trial court's charge to the jury (Ground Fifteen); and

(xii)    A Due Process Clause challenge to Petitioner's inability to make a full record for appellate review (Ground Sixteen).

The Court considers these claims in turn, and finds each to be inadequate to

merit relief.

### a.    Petitioner's Fourth and Fifth Amendment Claims Are Barred from Review or Without Merit

Petitioner asserts three interrelated claims concerning his arrest: that he was arrested without probable cause (Ground One); that the trial court erred by not holding a probable cause hearing with regard to this arrest (Ground Seventeen); and that the court impermissibly admitted statements made in connection with this arrest (Ground Eighteen).  None succeeds.

Petitioner's first claim, that his arrest was without probable cause and that evidence resulting from it should have been suppressed, is barred by *Stone* v. *Powell*, 428 U.S. 465 (1976).  The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 480-82; *accord Young* v. *Conway*, 698 F.3d 69, 85 (2d Cir. 2012).  *Stone*'s bar against review of Fourth Amendment claims is equally applicable to claims for arrest without probable cause.  *See Bowman* v. *Racette*, No. 12 Civ. 4153 (LTS)(SN), 2015 WL 1787130, at *19 (S.D.N.Y. Apr. 20, 2015); *Carter* v. *Wooghter*, No. 10 Civ. 2143 (ER), 2015 WL 1516667, at *6 (S.D.N.Y. Apr. 3, 2015).

Petitioner's second claim, that the trial court erred by not holding a probable cause hearing, calls to mind the narrow exception to *Stone*'s bar on habeas review of Fourth Amendment claims that exists where either "[i] the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or [ii] if the state has provided a corrective mechanism,

but the defendant was precluded from using that mechanism because of an 'unconscionable breakdown' in the underlying process." *Cappellan* v. *Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Yet it is well established that New York provides an adequate corrective procedures for adjudicating Fourth Amendment claims in criminal proceedings. *See id.* at 70 n.1 ("[F]ederal court have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 et seq., ... as being facially adequate." (internal quotation marks and citation omitted)); *see also Daily* v. *New York*, 388 F. Supp. 2d 238, 249 (S.D.N.Y. 2005) ("The State of New York clearly has provided defendants ... with the necessary corrective procedure through Section 710 of the New York Criminal Procedure Law.").

The issue identified by Petitioner with that procedure — the failure to hold a probable cause hearing — does not represent an "unconscionable breakdown," but rather an established procedural mechanism for disposing of frivolous objections. *See* N.Y. Crim. Proc. Law § 710.60(3) (allowing a court to "summarily deny" a suppression motion where "[t]he motion papers do not allege a ground constituting legal basis for the motion" or "[t]he sworn allegations of fact do not as a matter of law support the ground alleged"). In denying a probable cause hearing, the trial court acted pursuant to this recognized mechanism; as such, federal courts "have no authority to review the state record and grant the writ simply because [they] disagree with the result reached by the state courts." *Gates* v. *Henderson*, 568 F.2d 830, 840 (2d Cir. 1977); *accord Cappellan,* 975 F.2d at 72 ("[A] mere disagreement with the

outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process.").

Finally, Petitioner challenges the admission of the statement he made to Detective Sanchez upon being brought to the SOMU, in which, according to Sanchez, Petitioner stated that he would not give Sanchez requested information and would not return to SOMU.  (Dkt. #14-4 at 190-91).  Petitioner does not challenge the admission of his statement — made, according to Sanchez, after administration of a *Miranda* warning (*id.* at 191-97) — on the grounds that it was involuntary, and thus in violation of the Fifth Amendment's Self Incrimination Clause, but rather on the grounds that Sanchez simply made the statements up.  As such, it is less a constitutional challenge than an evidentiary one, and fails to clear the high hurdle set before such claims.  *See Estelle* v. *McGuire,* 502 U.S. 62, 67-68 (1991) (reiterating that evidentiary challenges under state law are not cognizable in a habeas review); *Varela* v. *Marshall*, 520 F. Supp. 2d 471, 477 (S.D.N.Y. 2007) ("[S]tate evidentiary rulings are generally a matter of state law and not subject to habeas review.").  In that regard, habeas relief is only available if the petitioner can show that an erroneous evidentiary ruling was "so extremely unfair that its admission violates fundamental conceptions of justice," *Dunnigan* v. *Keane*, 137 F.3d 117, 125 (2d Cir. 1998), *abrogated on other grounds by Perry* v. *New Hampshire*, 132 S. Ct. 716 (2012), or was "so pervasive as to have denied [the petitioner] a fundamentally fair trial," *Collins* v. *Scully*, 755 F.2d 16, 18 (2d Cir. 1985). Moreover, the challenged evidence must have been "sufficiently material to

36

provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan*, 137 F.3d at 125.  Petitioner fails to explain how the decision to put a contested statement before the jury for a credibility determination violated fundamental conceptions of justice, or how the introduction of two truculent statements about Petitioner's intended future behavior provided the basis for a conviction based upon months of past failure to register.

### b.     Petitioner Was Properly Sentenced

Petitioner's second ground for relief is that he was sentenced to a class D felony instead of a class E felony, in violation of the Ex Post Facto Clause. (Pet. 7; SR 117, 165).  Petitioner, however, has confused the amendments to SORA outlined above.  Section 168, as originally enacted in 1996, provided that a first offense for failure to register or verify registration would result in a class A misdemeanor and a subsequent offense a class D felony.  1995 N.Y. Laws 192 § 168-t; *see Willette* v. *Fischer*, 508 F.3d 117, 118 (2d Cir. 2007).  In 2007, the law was amended to elevate a first offense from a misdemeanor to a class E felony; subsequent offenses continued to be a class D felony.  2007 N.Y. Laws 373 § 168-t; *see Willette*, 508 F.3d at 119 n.2.  Thus, under either version of the statute, a subsequent offense is punishable as a class D felony: the punishment for failure to register has not been increased.  Petitioner pleaded guilty to failure to register as a sex offender on October 18, 1998 (Pet. 42; Dkt.

#14-5 at 154-55; Dkt. #14-7 at 20); his second conviction in the underlying case constitutes a class D felony under any version of SORA.[16]

### c.   Petitioner's Evidentiary Objections Fail

Ground Three of the Petition alleges that the trial court admitted into evidence two illegal certificates of conviction (1997-98 and 2005) and one illegal risk level determination document. (Pet. 8; SR 117).  Ground Four of the Petition advances a general allegation that the People of the State of New York offered illegal documentary evidence in both grand jury and trial proceedings. (Pet. 10; SR 117, 119).  Ground Six claims that the trial court excluded "exculpatory evidence."  (Pet. 14; SR 117).  The Court reviews these claims together as a general objection to various evidentiary rulings.[17]

As noted above, there is a strong presumption against granting habeas challenges to state evidentiary rulings.  *See Estelle* v. *McGuire*, 502 U.S. at 67-68; *Dunnigan*, 137 F.3d at 125.  Habeas relief is only available if the petitioner can show that an erroneous evidentiary ruling was "so extremely unfair that its admission violates fundamental conceptions of justice," *Dunnigan*, 137 F.3d at 125, or was "so pervasive as to have denied [the petitioner] a fundamentally fair trial," *Collins*, 755 F.2d at 18.  Moreover, the challenged evidence must have

---

[16]   To the extent Petitioner challenges the increases in registration obligations, that argument is foreclosed by *Doe* v. *Cuomo*, 755 F.3d 105 (2d Cir. 2014), which held that the amendments to SORA's registration and notification provisions were primarily non-punitive in nature, and thus did not trigger the protections of the Ex Post Facto Clause. *Id.* at 110-12.

[17]   Petitioner argues more broadly that swathes of documentary evidence were falsified or forged.  (*See* SR 121).  However, Petitioner offers no evidence beyond his own assertions, and thus the Court rejects these vague claims.  *See Cameron* v. *Cunningham*, No. 13 Civ. 5872 (KPF)(FM), 2014 WL 4449794, at *3 (S.D.N.Y. Sept. 9, 2014).

been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan*, 137 F.3d at 125.

Petitioner fails to meet this standard with regard to any of the six challenged pieces of evidence.  With regard to the 1997 certificate of conviction, there is no evidence in the record that it was ever admitted into evidence; rather, the conviction was stipulated to by the parties (Dkt. #14-6 at 35), making a challenge to the trial court's decision particularly farfetched.

With regard to the 1998 certificate of conviction, there is admittedly some confusion over its substance: the trial court suggested that there were convictions for both trespassing and failure to register, while Petitioner contends that the sole charge to which he pleaded guilty was trespassing. (*Compare* Dkt. #14-6 at 137-38, *with id.* at 14-15, 23, 135-41).  Yet according to both the court reporter's transcript and the clerk's minutes, Petitioner pleaded guilty to the failure to register charge.  (Dkt. #14-5 at 154-55; Dkt. #14-7 at 20).  Thus, the decision to admit the certificate of conviction (Pet. 42) was entirely reasonable, and certainly did not work a miscarriage of justice sufficient to properly invoke habeas review.

Petitioner next challenges his risk redetermination hearing, and the admission of its result at trial, on two grounds.  First, Petitioner argues that it was required that the hearing be conducted by the sentencing judge.  (SR 120). Petitioner has failed, however, to offer any evidence to support his allegation that the 1997 certificate of conviction was altered to misidentify the sentencing

judge (*see* SR 120), and the only evidence presented to the trial court identified

Justice McLaughlin as the jurist who conducted the determination and the

redetermination proceedings (Dkt. #14-3 at 131).  Thus, because Petitioner has

failed to present "clear and convincing evidence" that the implicit factual

determination made by the trial court as to the 1997 sentencing judge was

incorrect, *see* 28 U.S.C. § 2254(e)(1), the Court is unable to overturn this

finding.[18]

Petitioner further argues that the 2009 annual registration form, which

was mailed to his last known address and returned, should not have been

admitted because the address was incomplete, thus explaining its return.

(SR 121).  Yet Petitioner testified that he had moved from 545 West 146th

Street (where the form was mailed to) to 894 Riverside Drive on June 10, 2008.

(Dkt. #14-6 at 117).  The annual verification form was mailed to Petitioner on

February 11, 2009 (Dkt. #14-4 at 115-17, 119-20); thus, the letter never would

have made it to Petitioner, regardless of whether it specified an apartment

number.

Finally, the two documents offered through the testimony of Sex Offender

Registration Program Manager Pamela Gaitor — copies of Petitioner's original

1996 registration and his 2007 change of address form — had an extensive

foundation laid that established them as reliable copies of government records.

Moreover, it has repeatedly been noted that the best evidence rule is a state law

---

[18]     Petitioner additionally argues that his risk redetermination hearing was defective
because his registration obligations had expired five months prior to his
redetermination hearing, which was held on June 20, 2005.  (SR 119-20; Pet. 54-55).
This argument goes to the validity of his conviction, which is addressed separately *infra*.

evidentiary principle rather than a constitutional mandate, and thus is not a proper subject of habeas relief.  *See, e.g.*, *Blake* v. *Martuscello*, No. 10 Civ. 2570 (MKB), 2013 WL 3456958, at *6 (E.D.N.Y. July 8, 2013), *appeal dismissed* (Oct. 21, 2013); *U.S. ex rel. Banks* v. *Henderson*, 394 F. Supp. 1316, 1318 (S.D.N.Y. 1974) ("There is, finally, an issue said to arise under the best-evidence rule. Whether it does, as petitioner says, or does not, as respondent says, is not a matter of moment.  Either way, it is not a topic for federal habeas.").

Petitioner additionally challenges the exclusion of an affidavit by Gaitor (Pet. 51-52), which affidavit stated that Petitioner's registration obligations actually began in 1995.  As explained later in this Opinion, the precise date of Petitioner's initial registration is irrelevant due to subsequent amendments to the registration periods.  Furthermore, Petitioner was not denied access to this document; his counsel simply chose not to introduce it, correctly perceiving it to be an "immaterial inconsistency."  (Dkt. #14-8 at 70).  The affidavit is not exculpatory, and its exclusion from trial does not meet the high bar to granting habeas relief for either evidentiary errors.  *See Estelle* v. *McGuire*, 502 U.S. at 67-68.  Nor does it suffice to constitute ineffective assistance of counsel, for the reasons set forth in the next section.

### d.     Petitioner's Claim of Ineffective Assistance of Counsel Does Not Provide Grounds for Habeas Relief

Ground Five asserts that Petitioner's conviction was obtained due to ineffective assistance of counsel.  (Pet. 12; SR 118, 168).  To establish ineffectiveness, Petitioner must satisfy the two-pronged test of *Strickland* v. *Washington*, 466 U.S. 668 (1984).  First, Petitioner must show that counsel

41

was so deficient that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *id.* at 690. "The proper standard for attorney performance is that of reasonably effective assistance," *id.* at 687, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.* at 690. Second, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *accord Gonzalez* v. *United States*, 722 F.3d 118, 130 (2d Cir. 2013). Thus, in order to be ineffective, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Furthermore, in the context of federal habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Knowles* v. *Mirzayance*, 556 U.S. 111, 123 (2009). Thus, "for claims of ineffective assistance of counsel, ... AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods* v. *Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Burt* v. *Titlow,* 134 S. Ct. 10, 13 (2013)).

Petitioner points to several alleged lapses, including that his defense counsel (i) failed to object on "several occasions"; (ii) failed to call a witness on

Petitioner's behalf; (iii) failed to subpoena two other witnesses; (iv) did not take the trial seriously; and (v) assisted the prosecution, thereby evincing a conflict of interest.  These assertions are largely baseless, and neither Petitioner's papers nor the record supports the argument that counsel performed deficiently or that Petitioner suffered prejudice necessitating habeas relief.

A review of the record confirms that defense counsel objected frequently and often followed up to argue his point.  For instance, as the People tried to introduce evidence of Petitioner's initial registration form with DCJS, counsel objected six times and then conducted a *voir dire* before the trial court admitted it as a business record.  (Dkt. #14-6 at 102-07).  Counsel also objected to what was read into the record from Petitioner's 1998 certification of conviction.  (Dkt. #14-7 at 19-21).

Moreover, defense counsel's alleged failure to call witnesses does not give rise to a *Strickland* claim.  As a general matter, "[a] failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."  *United States* v. *Eyman,* 313 F.3d 741, 743 (2d Cir. 2002).  More specifically, Petitioner identifies two witnesses who should have been called: Petitioner's landlord "Miguel" (SR 168), and Petitioner's parole officer David Segal (Pet. Reply 6-7).  Petitioner entirely fails to identify what critical evidence Miguel would have offered, thus failing to establish *Strickland*'s prejudice prong.  As for Segal, the parties were unable to locate him, and the trial court (after extensive argument by defense counsel) refused to issue a missing witness instruction.  (Dkt. #14-5 at 94-97).  Even if the

43

failure to secure such an instruction or procure Segal's presence by other means did constitute ineffective assistance, Petitioner has failed to demonstrate why the trial court was incorrect to deem his potential testimony merely cumulative.  (*Id.*).  Petitioner similarly fails to identify what other witnesses should have been subpoenaed, how the failure to do so represents an unreasonable departure from professional norms, or what prejudice might have resulted from such failure.

Finally, Petitioner argues that his trial counsel either did not take the trial seriously or actively aided the prosecution.  His evidence for the former claim is that Petitioner's counsel attempted to make a reference to a Star Trek episode and an interview with the actor Leonard Nimoy during his summation. (SR 168; Dkt. #14-7 at 86).  Although the approach may have been somewhat unorthodox, it was a matter of trial strategy, and certainly not so deficient as to breach the standards of the legal profession.  Furthermore, the trial court very quickly cut off this portion of counsel's summation.  (Dkt. #14-7 at 117-18). Given the brevity of the digression, it is difficult to identify any prejudice.

As for the claim that defense counsel "continuously aided the prosecution," Petitioner asserts that "most of the assistance is depicted in the minutes," and that he filed several grievances against his trial counsel. (Pet. 12).  Yet counsel argued with trial court for additional legal argument time (Dkt. #14-2 at 202-06); fought to prevent documents from being admitted in evidence, arguing in part that certain documents were illegal (*id.* at 209-11, 220); argued that Petitioner was not required to register every 90 days based on

*Doe* v. *Pataki* (*id.* at 215-17); disagreed about whether the People's witnesses could be called (Dkt. #14-3 at 4-6); and made numerous objections during the course of trial (*see, e.g.*, Dkt. #14-4 at 103).  Petitioner also invokes in his reply a litany of failures to object to certain evidence or to adopt arguments advanced by Petitioner (Pet. Reply 4-9), but "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect," *Yarborough* v. *Gentry*, 540 U.S. 1, 8 (2003); *accord Henry* v. *Poole*, 409 F.3d 48, 63 (2d Cir. 2005) ("Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." (quoting *Strickland*, 466 U.S. at 689)). Petitioner has failed to demonstrate not only that his counsel's performance was deficient or prejudicial, but also that the Appellate Division's rejection of his *Strickland* claim was unreasonable.

### e.    Petitioner's Registration Obligations Under SORA Did Not Expire on February 14, 2005

Petitioner's seventh, thirteenth, and fourteenth grounds for relief all revolve around the contention that his ten-year SORA registration obligations expired on February 14, 2005, prior to his risk redetermination hearing, and thus that he cannot have validly been convicted of failure to register or verify. (Pet 15-17; SR 117-18).[19]  These claims implicate two issues: first, whether Petitioner's initial registration obligations began on February 14, 1995, or

---

[19]    The Court interprets Petitioner's fourteenth ground for relief — that the verdict was against the weight of the evidence — as a claim for actual innocence on these grounds, as the former claim is not cognizable on habeas review.  *See Douglas* v. *Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002).

February 14, 1996; and second, the effect of the November 19, 1996 reversal of Petitioner's initial conviction.

Petitioner's initial registration form had two dates stamped on it: February 14, 1995, and February 14, 1996. (Dkt. #14-4 at 102-03, 122). Yet as Gaitor testified, the 1995 date cannot possibly be correct, because SORA's registration obligations did not take effect until January 21, 1996 (*id.* at 122); thus, the initial registration obligation arose from the 1996 date, putting the June 2005 redetermination hearing well within the ten-year initial period. While Petitioner's confusion is understandable, the trial court's determination that the initial designation occurred in 1996 rather than 1995 cannot be clearly and convincingly shown to be incorrect. Moreover, the Court notes that in 2002 the minimum registration period for all sex offenders was increased to 20 years, extending the expiration of Petitioner's registration obligations even further beyond the date of the 2005 hearing. *See Doe* v. *Cuomo*, 755 F.3d at 108-09.[20]

The second issue is the effect of the 1996 reversal of Petitioner's initial conviction and his retrial and conviction in 1997. Petitioner may be correct that, because there was no judicial risk determination following his 1997

---

[20]    Petitioner argues that the precise date is relevant because the settlement in *Doe* v. *Pataki* requires that redetermination hearings occur within 10 years, or alternatively set an expiration of registration requirements if no such hearing has taken place within 10 years. (Pet. Reply 14). This argument is simply incorrect; the ten-year period identified in Paragraph 15 of the stipulation speaks only to the duration of registration obligations *after* a risk level redetermination has been made pursuant to the settlement. *See* New York State Division of Criminal Justice Services, *SORA Settlement* ("SORA Settlement"), http://www.criminaljustice.ny.gov/nsor/sora_settlement.htm (last visited May 18, 2015).

conviction, the application of the risk level three reporting obligations to Petitioner between 1997 and 2005 was unwarranted.  (*See* SR 167).  Yet the 2005 risk redetermination hearing cured whatever defect might have existed for two reasons.  First, because Justice McLaughlin presided over both the 1997 retrial and the 2005 redetermination, the 2005 "redetermination" constitutes a valid, if tardy, initial risk level determination.  *See* N.Y. Correct. Law § 168-l (McKinney 2005) ("A failure … by a court to render a determination within the time period specified in this article shall not affect the obligation of the sex offender to register or verify under this article nor shall such failure prevent a court from making a determination regarding the sex offender's level of notification[.]"); *People* v. *Wilkes*, 862 N.Y.S.2d 232 (4th Dep't 2008) (upholding a nine-year delay between sentencing and risk level determination); *People* v. *Martin*, 989 N.Y.S.2d 226 (4th Dep't 2014) (upholding six-year delay), *leave to appeal denied*, 24 N.Y.3d 906 (2014).

Second, because he was incarcerated on January 21, 1996, based upon a crime committed prior to the passage of SORA, Petitioner was a member of the putative plaintiff class in *Doe* v. *Pataki*.  *See* SORA Settlement.  Thus, even if Petitioner had no registration obligations in February 2005, he was able to validly (if unwisely) avail himself of the terms of the settlement, including the risk level redetermination hearing offered to him.  Having done so, Petitioner cannot now claim that the hearing or the level three risk designation was invalid: he was a member of the class, and submitted himself to a hearing pursuant to the stipulated class settlement.  Therefore, as the trial court found,

by the time of the actions giving rise to his 2009 arrest, Petitioner's obligations under SORA were clear.  (Dkt. #14-2 at 184).

> **f.**     **Petitioner Was Not Wrongfully Forced to Wear Prison Attire**

Petitioner's eighth ground for relief is that he was wrongfully forced to appear before the jury in prison attire.  (Pet. 18; SR 117).  The Supreme Court has held that "an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system." *Estelle* v. *Williams*, 425 U.S. 501, 504 (1976).  The Court, however, emphasized the importance of compulsion, holding that a defendant's voluntary decision (or failure to make known his unwillingness) to wear prison garb does not constitute a constitutional violation.  *Id.* at 512-13.

Courts applying *Estelle* v. *Williams* have held that "although a defendant may not be compelled to stand trial in identifiable prison garb, a defendant has no right under state or federal law to be provided with any particular type of civilian clothing." *Van Gorder* v. *Allerd*, 387 F. Supp. 2d 251, 261 (W.D.N.Y. 2005) (internal citation omitted); *accord Adams* v. *Smith*, 280 F. Supp. 2d 704, 718 (E.D. Mich. 2003) ("Petitioner has pointed to no Supreme Court case that prohibits an accused from appearing at trial in improperly fitted civilian clothes.").  The Sixth Circuit, meanwhile, has held that where a trial court is willing to wait to allow other clothes to be obtained, but proceeds when they cannot be, no constitutional violation is worked.  *United States* v. *Williams*, 641 F.3d 758, 767 (6th Cir. 2011).

Here, Petitioner was offered civilian clothing consisting of a blue button-down shirt, a pair of blue jeans, and a gray sweater vest.  (Dkt. #14-2 at 200). Petitioner registered numerous complaints about the outfit, including that the jeans were too large and looked like "gangster jeans" (*id.* at 200-01), that the sweater vest was ripped and "unbecoming" (*id.* at 201), and that the shirt was "wrinkled, terribly wrinkled" (Dkt. #14-3 at 4).  Petitioner ultimately wore the shirt provided by the trial court, and it is unclear what pants he wore initially. (*Id.*).  In addition, Petitioner informed the trial judge that he had procured a suit but that prison officials had misplaced it; a request for an adjournment to allow Petitioner to locate and wear the suit was denied.  (Dkt. #14-2 at 228-30). By the second day of trial, however, additional clothing had been procured, with the trial court noting that "[t]he defendant is wearing nice black pants, black shoes, striped shirt, and his waist belt."  (Dkt. #14-3 at 133).

Here, the misplacement of Petitioner's suit by corrections officers, the trial court's unwillingness to adjourn trial to locate the desired clothing, and the poor quality of the replacement garb tread close to the line of compelling Petitioner to wear shabby clothing to trial.  Yet neither the logic nor the holding of *Estelle* v. *Williams* suggests that such compulsion violates a clearly established constitutional right: the Court's concern was not that juries would judge a defendant's unbecoming sartorial choices, but rather that to appear specifically in prison garb would undermine the presumption of innocence. *See* 425 U.S. at 504.  Compelling a defendant to wear an ill-fitting shirt and baggy jeans may be ungenerous, but it does not work a constitutional wrong.

### g.     The Jury Was Not Improperly Selected

Petitioner argues, for his ninth ground for relief, that the jury was unconstitutionally selected and empaneled.  (Pet. 20-22).  In particular, he claims that the prosecutor's use of peremptory challenges against three of the four African-American prospective jurors violated the Equal Protection Clause under *Batson*.  In the alternative, Petitioner argues that the trial court erred in denying his for-cause challenge to a potential juror who was "not sure" whether she would be influenced in her deliberations by the presence of another potential juror on the jury.  These challenges to the jury were the only claims raised on appeal by Petitioner's appellate counsel (*see* SR 7), and were discussed in depth by the Appellate Division (*id.* at 207-09).

### i.     The *Batson* Challenge

Racially motivated preemptory challenges violate the Equal Protection Clause of the Fourteenth Amendment.  *See Batson*, 476 U.S. at 96.  The Supreme Court has articulated a three-part burden-shifting test to determine whether such challenges violate a defendant's constitutional rights.  First, the defendant must make "a *prima facie* showing that the prosecutor has exercised a peremptory strike on the basis of race."  *Jordan*, 206 F.3d at 200; *Batson* 476 U.S. at 96-97.  The defendant may fulfill this step by, for example, pointing to a "pattern" of strikes against jurors of a particular group or by referencing the prosecutor's questions during *voir dire* examination.  *Batson*, 476 U.S. at 97.  Second, the burden shifts to the prosecution to present "a race neutral explanation for striking the potential juror."  *Jordan*, 206 F.3d at 200.  "Unless

50

a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett* v. *Elem*, 514 U.S. 765, 768 (1995) (quoting *Hernandez* v. *New York*, 500 U.S. 352, 360 (1991) (plurality opinion)). The race-neutral explanation need not be "persuasive, or even plausible." *Id.* Finally, at the third step the court determines "whether the defendant has carried his burden of proving purposeful discrimination" based on all the facts and circumstances. *Jordan*, 206 F.3d at 200; *see also Dolphy* v. *Mantello*, 552 F.3d 236, 238-39 (2d Cir. 2009). The trial court's determination regarding the prosecution's discriminatory intent is afforded great deference "because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El* v. *Cockrell*, 537 U.S. 322, 339 (2003).

During the first round of jury selection, the trial court and counsel questioned four African-American prospective jurors. (Dkt. #14-3 at 99). The prosecution used peremptory challenges on three of these four prospective jurors, the surnames of whom were Grant, Evans, and Abdullah. (*Id.* at 99-100). Defense counsel raised a *Batson* challenge; the trial court agreed that there was a pattern of striking African Americans, and asked the prosecutor to present her reasons for striking the African-American prospective jurors. (*Id.*). The prosecutor explained that she had challenged Evans because of her "lack of education," noting that she had "a high school diploma, and no further education." (*Id.* at 100). The prosecutor explained that she had challenged Abdullah on the grounds that "the gentleman's suit, as well as his clothing,

indicates a behavior of concern to the People." (*Id.*).  And finally, she explained that she had challenged Grant because he was an artist, and "[i]n general, [the] People don't want artists on the jury." (*Id.*).  Defense counsel argued that the "alleged race-neutral reasons provided by the prosecutor [were] ... pretense," noting the failure to ask any questions of Evans and Grant.  (*Id.* at 101-02).

After "grappl[ing] with this," the trial court determined that the prosecution's proffered explanations, while not "the greatest reason[s]," were not "motivated by race." (Dkt. #14-3 at 102-03).  The trial court noted that the prosecution had not stricken juror Williams, who was also African American. The court subsequently elaborated that Abdullah's dress "was very striking": "He was wearing a white sort of jacket, white Panama hat," and the prosecutor added that he had "large jewelry on his neck." (*Id.* at 109-10).  Ultimately, Justice Wittner accepted these race-neutral explanations.  (*Id.* at 110).

In his counseled brief to the Appellate Division, Petitioner argued that the education-related explanation for striking Evans was pretextual because the People did not challenge prospective juror Crespo in the second round of jury selection for also having only a high school diploma.  (*See* SR 26).  The Appellate Division found this argument to be unpreserved, because Petitioner had not raised the comparison between prospective jurors Evans and Crespo at trial, and in the alternative without merit.  (*Id.* at 208).  Because the Appellate Division explicitly invoked a procedural bar to hearing this portion of Petitioner's claim, this Court is unable to consider it "absent a showing of cause for the default and resulting prejudice or a demonstration that failure to

52

consider the federal claim will result in a fundamental miscarriage of justice."
*Velasquez* v. *Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (internal quotation marks
and citations omitted).  Petitioner has failed to meet this burden, as
inconsistency of explanations alone generally does not suffice to overcome the
deference due to a trial court's finding that a peremptory challenge was not
impermissibly motivated.  *See, e.g.*, *Bracero* v. *Greiner*, No. 00 Civ. 5512 (NRB),
2004 WL 1846298, at *6 (S.D.N.Y. Aug. 17, 2004) ("Apart from demonstrating
that there were apparent inconsistencies in the prosecutor's application of her
reasons for exercising her peremptory challenges, [Petitioner] does not provide
any other evidence to demonstrate that it was an error for the trial court to
accept the sex-neutral explanations offered by the prosecutor.").

　　　In the absence of the ability to raise this inconsistency argument,
Petitioner is left with little grounds to challenge the credibility determination of
the trial court.  "Factual determinations by state courts are presumed correct
absent clear and convincing evidence to the contrary, and a decision
adjudicated on the merits in a state court and based on a factual determination
will not be overturned on factual grounds unless objectively unreasonable in
light of the evidence presented in the state-court proceeding."  *Miller-El*, 537
U.S. at 340 (citing 28 U.S.C. § 2254(e)(1), (d)(2)); *see also Hernandez*, 500 U.S.
at 369 (O'Connor, J., concurring in the judgment) ("The credibility of the
prosecutor's explanation goes to the heart of the equal protection analysis, and
once that has been settled, there seems nothing left to review.").  Courts
routinely uphold as race neutral challenges based upon employment, *see*

*Funches* v. *Walsh*, No. 05 Civ. 2839 (NRB), 2006 WL 1063287, at *6 (S.D.N.Y. Apr. 21, 2006) (collecting cases), *aff'd*, 264 F. App'x 45 (2d Cir. 2008) (summary order), and have specifically accepted prosecutors' explanations that artists might make unreliable jurors, *see United States* v. *Moreno*, 878 F.2d 817, 820-21 (5th Cir. 1989); *Funches*, 2006 WL 1063287, at *5-6.   Similarly, courts have upheld explanations based upon a potential jurors' outfit, *see United States* v. *Samayoa*, 27 F. App'x 833, 835 (9th Cir. 2001) (summary order), or educational status, even where applied inconsistently, *see Delvalle* v. *Herbert*, 129 F. App'x 646, 648-49 (2d Cir. 2005) (summary order). Accordingly, the Court finds no cause to overturn the finding of the state courts that the prosecution's peremptory challenges were not motivated by race.

### ii.   The Denial of Petitioner's For-Cause Challenge Does Not Provide Grounds for Habeas Relief

Petitioner further argues that the trial court erred in denying his for-cause challenge to a prospective juror.   In the *venire* for his case were prospective jurors Ugras, a surgical resident at Cornell Presbyterian Medical Center working in "research and oncology," and Dakin, an attending trauma surgeon at Cornell Presbyterian who trains approximately eight residents each year.   (Dkt. #14-3 at 41, 43-44).   Defense counsel asked, after Ugras stated that she was "not sure" she could be impartial if impaneled with Dakin (*id.* at 45), that she be struck.   The trial court denied this request, and Petitioner later used two of his preemptory challenges to strike Ugras and Dakin.   (*Id.* at 89-90, 95, 104).

"[T]he Supreme Court has made clear, at least in the criminal context, that a party's use of a peremptory strike to cure a court's erroneous failure to dismiss a juror 'for cause' effects neither a constitutional nor a rule-based deprivation, as long as the jury eventually empaneled is impartial." *Cruz* v. *Jordan*, 357 F.3d 269, 271 (2d Cir. 2004); *accord United States* v. *Martinez-Salazar*, 528 U.S. 304, 317 (2000) (holding that a defendant's exercise of peremptory challenges is not denied or impaired when defendant elects to use a challenge to remove a juror who should have been excused for cause); *Ross* v. *Oklahoma*, 487 U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). Accordingly, Petitioner's claim that the trial court should have granted his peremptory challenge as to a potential juror is not a proper ground for habeas relief.

### h. The Conduct of Certain Proceedings Outside Petitioner's Presence Did Not Violate the Confrontation Clause or Petitioner's Right to Represent Himself

Petitioner makes two claims relating to the conduct of certain proceedings outside of his presence: first, that the trial court improperly reassigned his counsel to conduct a pretrial suppression hearing outside Petitioner's presence after counsel had been relieved; and second, that the court erred in allowing certain witnesses to testify outside Petitioner's presence. (SR 117-18). Neither of these claims merits habeas relief.

The Supreme Court has held that the Confrontation Clause guarantees "the accused's right to be present in the courtroom at every stage of his trial."

*Illinois* v. *Allen*, 397 U.S. 337, 338 (1970), and that the Due Process Clause protects a defendant's right to be present for nontestimonial portions of trial where his presence bears "a relation, reasonably substantial, to his opportunity to defend against the charge," *Snyder* v. *Commonwealth of Massachusetts*, 291 U.S. 97, 106 (1934), *overruled in part on other grounds sub nom. Malloy* v. *Hogan*, 378 U.S. 1 (1964).  The right to be present to confront witnesses can be waived by voluntary absence from trial after it has begun, *see Taylor* v. *United States*, 414 U.S. 17, 18-20 (1973), and can also be forfeited where, for example, "an accused … engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial," *Allen*, 397 U.S. at 338.  The right to be present for nontestimonial portions of trial, meanwhile, does not pertain where "when presence would be useless, or the benefit but a shadow."  *Snyder*, 291 U.S. at 106-07.

The Supreme Court has held that "the right to be present during all critical stages of the proceedings and the right to be represented by counsel … as with most constitutional rights, are subject to harmless error analysis, unless the deprivation, by its very nature, cannot be harmless." *Rushen* v. *Spain*, 464 U.S. 114, 119 (1983) (internal citations omitted).  The Second Circuit, analyzing this and other relevant Supreme Court precedent, has distinguished between "trial errors," which are subject to harmless error review, and "structural errors," which undermine the fundamental integrity of the trial process and are subject to automatic reversal.  *Yarborough* v. *Keane*, 101 F.3d 894, 896-97 (2d Cir. 1996) (citing, among other cases, *Arizona* v.

*Fulminante*, 499 U.S. 279 (1991)).  Specifically applying this framework to an absence from trial, the Court looked at "not only at the right violated, but also at the particular nature, context, and significance of the violation," and concluded that the "absence of the defendant from a peripheral proceeding of secondary importance is subject to harmless error review." *Id.* at 897-98.

Petitioner's absence at the pretrial suppression hearing was both the result of a voluntary forfeiture and, if in error, a harmless error.  The absence was the result of a series of delays caused by Petitioner as well as ongoing conflict between Petitioner and Paul Feinman, Petitioner's counsel at the time (and his third appointed counsel by that point).  Petitioner and Feinman originally appeared for the hearing on January 25, 2010, at which time Petitioner asked the court to have Feinman relieved as counsel.  (Dkt. #14-2 at 7-8).  After an extensive colloquy on whether Petitioner truly wished to proceed pro se, Justice Charles Solomon adjourned the hearing to January 27, advising Petitioner that he would have to determine finally whether he wished to have Feinman relieved and represent himself.  (*Id.* at 58-59).

On January 27, Petitioner reportedly tripped on a set of stairs and injured himself, requiring another adjournment.  (Dkt. #14-2 at 70-71).  On February 2, the case was returned to Justice Wittner, but Petitioner was medically excused from Court.  (*Id.* at 71).  On February 9, Petitioner was medically cleared for court and brought to the courthouse, but proclaimed that he was in too much pain to come down from the holding cell.  (*Id.* at 71-72).  The case

was adjourned again to February 11, but Petitioner was medically excused on that day.  (*Id.* at 72).

On February 17, Petitioner was produced in court in a wheelchair, at which point the case was transferred to Justice Ronald Zweibel to conduct the hearing.  (Dkt. #14-2 at 72).  Yet when the case was called, Petitioner was unable or unwilling to come from the holding cell to the courtroom, declaring himself in too much pain despite specific warnings that his absence would waive his right to be present for the hearing.  (*Id.* at 72-73).  Justice Zweibel adjourned the hearing back to Justice Wittner's part for February 17 due to the absence of a proper wheelchair for Petitioner's use.  (*Id.* at 73).

Finally on February 18, 2010, the pretrial suppression hearing was held. Petitioner successfully walked and rode the bus from his holding facility to the courthouse, but was unable to make it from the courthouse holding cell to the courtroom, repeatedly sliding off his wheelchair and claiming back pain when officers attempted to lift him into the chair.  (Dkt. #14-2 at 64-69, 75-76).  At that point, after conveying several warnings via corrections officers, Justice Wittner found that Petitioner was deliberately refusing to come to the courtroom, and thus had forfeited his right to be present.  (*Id.* at 76-82, 84). Accordingly Justice Wittner proceeded with the hearing, with Feinman remaining as counsel.  (*Id.* at 82).  At the hearing, the parties examined and cross-examined Detective Sanchez regarding statements that he would testify Petitioner made to him upon his arrest, and Justice Wittner ultimately ruled that the statements were admissible at trial.  (*Id.* at 84-144; Dkt. #14-4 at 191-

99).  On March 31, 2010, Justice Wittner issued her ruling and also granted Petitioner's request to have Feinman removed as counsel; on April 7, 2010, Petitioner withdrew his request to proceed pro se and Justice Wittner appointed Andrew Freifeld, who remained as counsel throughout trial.  (*See* SR 185-86).

From these facts, the Court is not willing to say that it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), for Justice Wittner to determine that Petitioner had voluntarily waived his right to be present at the hearing.  Furthermore, even if the determination were erroneous, it would be subject to harmless error review under the Second Circuit's *Yarborough* analysis: the hearing concerned the testimony of a single witness, subject to cross-examination, regarding a handful of statements by Petitioner about his unwillingness to comply with future obligations.  The holding of the hearing was in fact doubly harmless: as discussed above, Petitioner's absence did not cause harm because Justice Wittner correctly determined that the statements should be admissible, and, even if incorrect, their admission is unlikely to have prejudiced the trial.

Petitioner's second absence was similarly both voluntary and harmless.  This absence occurred on August 4, 2010, after yet another delay on July 29, when Defendant was late to the second day of jury selection due to either a refusal to exit his cell or a need to take his medication.  (Dkt. #14-3 at 113, 133).  On August 4, Petitioner "refused to exit his cell" and had to be

"extracted."  (Dkt. #14-5 at 85).  Noting Petitioner's pattern of "delaying and obstructing their proceedings," Justice Wittner determined to go forward without him.  (*Id.* at 86).  After other proceedings, the jury was instructed to ignore Petitioner's absence and Officer Natalia Peralta was called to the stand to testify regarding her matching of Petitioner's fingerprint records across his three arrests.  (*Id.* at 114-15).  Following her testimony and cross-examination, Petitioner arrived at the courtroom.  (*Id.* at 143).

Once again, the trial court's determination that Petitioner's absence was voluntary was neither unreasonable nor, if incorrect, harmful.  Petitioner's repeated pattern of delays made it reasonable to determine that his absence was voluntary and, given his prior warnings about the consequences of absence, knowing.  Furthermore, the presentation of a single, technical witness outside Petitioner's presence worked no identifiable error.  When examining a potential Confrontation Clause violation, the Supreme Court has held that such error "is subject to *Chapman* harmless-error analysis," and that courts should examine "a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684 (1986) (citing *Chapman* v. *California*, 386 U.S. 18 (1967)).  These factors point to a finding of harmless error.  Petitioner's counsel ably cross-examined Peralta on the only identifiable

60

fault point: the possibility of confusion in identification numbers owing to recent renumbering by the State of New York. (Dkt. #14-5 at 130-32). Petitioner's counsel was not hampered in his cross-examination by Petitioner's absence, as Petitioner had no personal knowledge of Peralta's method of cross-identifying fingerprints or her qualifications to speak on the subject. Moreover, Peralta's testimony was cumulative of other evidence showing Petitioner's prior arrests, including Petitioner's 1998 certificate of conviction and the minutes from his guilty plea. (Dkt. #14-7 at 128-29 (prosecution's summation)). Thus, because the trial court reasonably found that Petitioner's absence from both proceedings functioned as a waiver of his right to be present, and because his absence was in any case harmless, neither absence merits relief from his conviction.

### i.    The Prosecution's Summation Did Not Deprive Petitioner of a Fair Trial

Petitioner also challenges the prosecutor's summation, specifically contending that the trial court erred in overruling an objection to the prosecutor's statement that Petitioner had presented forged documents of his visits to SOMU during the fall of 2008. (SR 162). The Supreme Court has noted that a claim of prosecutorial misconduct during closing argument requires a court to consider "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden* v. *Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly* v. *DeChristoforo*, 416 U.S. 637, 643 (1974)); *accord Bentley* v. *Scully*, 41 F.3d 818, 824 (2d Cir. 1994). The Second Circuit employs a three-part test to determine

whether prosecutorial misconduct deprived a defendant of a fair trial that considers "[i] the severity of the misconduct; [ii] the measures adopted to cure the misconduct; and [iii] the certainty of conviction absent the misconduct." *Osorio* v. *Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007) (citing *United States* v. *Elias*, 285 F.3d 183, 190 (2d Cir. 2002)).

Here, the prosecutor argued in her summation that three purported written confirmations of Petitioner's appearance at SOMU were forgeries. (Dkt. #14-7 at 136-39). She asked the jury to consider Officer Newkirk's explicit denial that she gave the petitioner those notes, Newkirk's absence from work on one of the days of the purported confirmation, and the plainly inconsistent handwriting across the documents. (*Id.*). The argument thus did not stray beyond the bounds of "a fair comment on the evidence at trial and reasonable inference therefrom." *Osorio*, 496 F. Supp. 2d at 301 (internal quotation marks omitted). Moreover, even if the prosecutor strayed slightly beyond the bounds of fair comment, any such minor aberration was cured by the judge's instruction to the jury that "[i]t is your own recollection, evaluation of the evidence … [that] controls the final verdict regardless of what either lawyer said today in their summation or throughout the trial." (Dkt. #14-7 at 146-47). *See Elias*, 285 F.3d at 192. Accordingly, the prosecution's summation did not deprive Petitioner of a fair trial.

###### j.    Petitioner Was Not Entitled to Review Redactions on Documents Submitted to the Jury

Petitioner further contends that he was not allowed to view the redactions to certain documents shown to the jury. (SR 118, 163). He claims

that he "continued to ask[] to review the redactions to hundreds of documents"
before they were sent back to the jury, and that the documents were "obviously
prejudicial in nature, otherwise the trial court would not have had to make a
ruling on the redactions to the documents, over my continuous objections."
(*Id.* at 163).  Petitioner's counsel, however, reviewed all of these redactions
(Dkt. #14-8 at 30), and Petitioner points to no clearly established federal law
stating that a counseled defendant is entitled to participate personally in
discussions about which portions of documents are to be submitted to the jury.
In effect, Petitioner argues that he should have been entitled to hybrid
representation, a position that has been firmly rejected by the Second Circuit.
*Ennis* v. *LeFevre*, 560 F.2d 1072, 1075 (2d Cir. 1977); *accord Bourdon* v.
*Loughren*, 386 F.3d 88, 100 (2d Cir. 2004).  Petitioner's challenge therefore can
only be appropriately made in the context of an ineffective assistance of
counsel claim, *see Ennis*, 560 F.2d at 1076, a claim that fails for the reasons
set forth above.

### k.        The Trial Court Did Not Give Improper Jury Instructions

Petitioner's fifteenth ground for relief is that the trial court's jury charge
improperly instructed the jury to "find defendant (appellant) guilty 'if you feel
that he changed his address' despite not being indicted on that charge."
(SR 118, 169).  For an erroneous jury instruction to entitle a petitioner to
habeas relief, "it must be established not merely that the instruction is
undesirable, erroneous, or even 'universally condemned,' but that it violated
some right which was guaranteed to the defendant by the Fourteenth

63

Amendment." *Cupp* v. *Naughten*, 414 U.S. 141, 146 (1973).  The Supreme Court has emphasized the importance of context, cautioning that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  *Id.* at 146-47.

Petitioner has not met the burden set forth by *Cupp*.  The instruction, read in context, did not suggest to the jury a fifth separate charge, but rather simply clarified that Petitioner could not escape the duty to return his registration letter where his failure to receive it was the result of a change of address.  (*See* Dkt. #14-8 at 13 ("If the defendant did not receive the letter because he failed to notify D.C.J.S. within ten days of his changed address, he still nevertheless may be convicted of this section.")).  The Court finds no error in this instruction under state law, and certainly no error so pernicious as to violate Petitioner's Fourteenth Amendment rights.

### 1. Petitioner Was Not Prevented from Making a Full Record for Appellate Review

Finally, Petitioner claims that he was prevented from having a meaningful opportunity to make a full record for appellate review because the trial court judge "walked out of the courtroom and told the court stenographer not to type and pack up — we are done." (SR 169).  Presumably, Petitioner is referring to the conclusion of sentencing, when Petitioner, having already made numerous legal arguments about the trial itself, was not allowed to continue to address the trial court after it had issued its sentence.  (*See* Dkt. #14-8 at 78). Yet nothing about the trial court's reluctance to hear indefinite argument as to innocence post-sentencing prevented Petitioner from making legal arguments

64

on appeal, as amply demonstrated by his lengthy filings, repeated reference to the trial record, and inclusion of numerous trial exhibits that he obtained. Furthermore, any deficiency in procedure after sentencing had already occurred would effectively constitute an error in post-conviction proceedings. Yet the Second Circuit has held that "alleged errors in a post-conviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief," *Word* v. *Lord*, 648 F.3d 129, 132 (2d Cir. 2011), a rule that has been applied to deny a habeas claim based upon a trial court's refusal to allow an affidavit to be read into the record subsequent to a verdict being rendered, *see Rogers* v. *Klee*, No. 07 Civ. 11902, 2014 WL 5499112, at *19 (E.D. Mich. Oct. 30, 2014). Accordingly, Petitioner had no clearly established constitutional right to make post-sentencing arguments at length, and any deprivation of such right worked no prejudice against his ability to make arguments at length on appeal.

## CONCLUSION

For the foregoing reasons, the Petition for a writ of habeas corpus is DENIED.  The Clerk of Court shall dismiss this Petition and close the case. Since Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  Additionally, pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith; therefore *in forma pauperis* status

is denied for the purpose of any appeal.  *See Coppedge* v. *United States*, 369

U.S. 438, 444-45 (1962).

      SO ORDERED.

Dated: May 18, 2015
      New York, New York

_____

KATHERINE POLK FAILLA
United States District Judge

> *A copy of this Order was mailed by Chambers to:*
>
>     Michael Toliver
>     10A4565
>     Shawangunk Corr. Facility
>     P.O. Box 700
>     Wallkill, NY 12589